UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

MARIANNE FIDISHIN,

        Plaintiff,

        v.

GARY COMMUNITY SCHOOL CORP.,

        Defendant.

CAUSE NO.: 2:18-CV-97-TLS

**OPINION AND ORDER**

This matter is before the Court on the Defendant's Motion for Summary Judgment [ECF No. 41], which is fully briefed and ripe for ruling. For the reasons set forth below, the Court GRANTS the Defendant's motion.

**PROCEDURAL BACKGROUND**

The Plaintiff Marianne Fidishin filed a Complaint [ECF No. 1] against the Defendant Gary Community School Corporation (GCSC), bringing claims under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, et seq., and the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601, et seq. Under Title VII, the Plaintiff asserted claims of race discrimination (Count 1), a hostile work environment (Count 2), and sex discrimination (Count 3). Under the FMLA, the Plaintiff alleged that the Defendant interfered with, discriminated against, and retaliated against the Plaintiff in relation to her exercising FMLA rights (Count 4).

On May 10, 2018, the Defendant filed a Motion to Dismiss [ECF No. 9], seeking to dismiss the case for failure to state a claim and lack of subject matter jurisdiction. On November 29, 2018, the Court granted the motion in part, and denied it in part. *See* Nov. 29, 2018 Op. & Order, ECF No. 20. The Court dismissed the hostile work environment and sex discrimination

claims but determined there were sufficient allegations to allow the race discrimination and FMLA claims to proceed. *Id.*

Following discovery, the Defendant filed its Motion for Summary Judgment on January 6, 2020, seeking to dismiss the remaining Title VII race discrimination claim (Count 1) and FMLA retaliation claim (Count 4).

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of [her] case on which [she] bears the burden of proof; if [she] fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). Facts that are

outcome determinative under the applicable law are material for summary judgment purposes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## FACTUAL BACKGROUND

### A.    The Plaintiff's Work at GCSC

The Plaintiff is a long-time teacher and administrator in special education, holding bachelor's and master's degrees in special education, a master's degree in social work, and a Ph.D. in research methodology. *See* Def. Ex. 1, 8:23–9:20, 12:3–15:22, ECF No. 43-1. In 2012, the Plaintiff was hired by GCSC to serve as its Executive Director of Special Education and Student Services. *Id.* at 17:15–21; Def. Ex. 20, ECF No. 43-20. She had been recruited for the position by Dr. Cheryl Pruitt, the superintendent of GCSC, with whom the Plaintiff had previously worked in another school district. Def. Ex. 1, 16:3–9, 17:25–18:15. As the Executive Director of Special Education and Student Services, the Plaintiff was the second-highest paid employee at GCSC, and her salary remained the same throughout her employment there. *Id.* at 17:23–24; Def. Ex. 23, 6–7, ECF No. 43-23.

In her position, the Plaintiff was responsible for, among other things, the district special education and student services administration and supervision, administration of federal and state reports, and other duties as assigned by the superintendent. Def. Ex. 2, ECF No. 43-2. Over the years, she took on additional duties unrelated to her position, including responsibility over security and transportation, as well as involvement with contract negotiations, curriculum development, discipline protocols, and school codes of conduct. Def. Ex. 1, 20:17–21:25. Regarding security and transportation, she was responsible for those areas from approximately 2014 until July 2016. *Id.* at 23:2–13; *see* Def. Ex. 5, ECF No. 43-5.

While at GCSC, the Plaintiff worked in the Central Office, which is where some of the GCSC administrators and support staff worked. *See* Def. Ex. 1, 29:13–30:8, 30:22–31:16, 33:11–22. Everyone who worked in the Central Office was African American, except for the Plaintiff, who is Caucasian, and the Assistant Director of Special Education, David Mekheil,[1] who is Egyptian.[2] *Id.* at 30:9–14, 76:13–17, 161:1–6. The Plaintiff testified that, from the time she started at GCSC in 2012 through 2015, nothing happened to make her feel there was racial bias, discrimination, or hostility. *Id.* at 36:10–17.

**B.    Problems with Dr. Pruitt**

In January 2016, things began to change. The Plaintiff first noticed that Dr. Pruitt "became a bit more erratic," explaining that she was "more aggressive, loud, more yelling in her interactions." *Id.* at 37:9–20. However, the Plaintiff noted that Dr. Pruitt's behavior was not directed toward her at this time. *Id.* at 38:16–21. Then, in May 2016, the Plaintiff and Dr. Pruitt attended a conference where the Plaintiff was invited to speak. *Id.* at 39:5–16. On the night they returned, Dr. Pruitt sent the Plaintiff the following text messages:

> Cheryl Pruitt: Safe travels home. By the way be careful talking to people. Are you thinking about leaving Gary? We shou[l]d talk Monday. I am getting an ear full about [special education] and people are talking about [how] arrog[a]nt you have become towards people. I need you and [Mr. Mekheil] to think about my style of getting things done, which is not what either of the two of you are reflecting right now. It has been going on for awhile and in local newspapers. Please take the time and reflect, ask him to do the same. Remember, nothing is a secret in Gary. Everybody talks. Have a good night. I am a bit disappointed and hurt. Are you calling the principals stupid?
>
> Plaintiff: Yes let's talk [] Monday

---

[1] The spellings "Mekheil" and "Mekhiel" are both used in the record. The Court uses "Mekheil" in this Opinion and Order because it is consistent with spelling used by GCSC's Executive Director of Human Resources. *See* Def. Ex. 21, ECF No. 43-21.

[2] The Defendant claims that Mr. Mekheil was classified by GCSC as white, but only cites to its answer to an interrogatory asking GCSC to identify "every Caucasian employed by GCSC in its central administrative office from January 1, 2012, through the present." *See* Def. Br. 21 n.2, ECF No. 42; Def. Ex. 23, 6–7.

> <u>Cheryl Pruitt</u>: Okay. Once people start hearing comments and seeing behaviors it is hard to stop it. I won't fight those battles. It affects my career and life. Trust is hard to come by.

Def. Ex. 3, ECF No. 43-3. The Plaintiff and Dr. Pruitt never met to discuss these issues. Def. Ex. 1, 48:9–22. After these text messages, the Plaintiff believes there was a "tension" between her and Dr. Pruitt. *Id.* at 48:23–49:3, 73:7–13.

At the end of May 2016, Dr. Pruitt emailed the Plaintiff raising concerns about the Plaintiff's quality of work and her workload, particularly in light of her security and transportation responsibilities. Def. Ex. 4, ECF No. 43-4. In her email, Dr. Pruitt wrote:

> I need you to keep a closer eye on [special education]. I understand that I have added a great number of responsibilities to your workload however I am hopeful that by moving the counselors to Dr. Jackson it may help. In addition, after we complete bus transportation response, I am hopeful that you will be relieved of that responsibility but will be able to delegate the logistics part to your secretary. Also, we will discuss security, if that will help as well. Let me know what else I can do. I am just concerned that some work has not been of the high quality that you have historically performed.

*Id.* The Plaintiff replied, "Understood." *Id.* According to the Plaintiff, this was the first time she was told of concerns regarding her work and workload. Def. Ex. 1, 62:6–12.

On July 25, 2016, Dr. Pruitt sent another email to the Plaintiff highlighting similar concerns, stating:

> I have a growing concern about your performance. It appears that in the last 6 months your attention to detail has diminished. When I return we need to sit and discuss this as I have provided the support for you to be able to handle the assignments and therefore do not understand. I will be relieving you of your assignment to oversee security and transportation. We can discuss more upon my return.

Def. Ex. 5. Likewise, the Plaintiff responded, "Understood and anticipate meeting with you." *Id.* However, Dr. Pruitt and the Plaintiff did not meet to discuss these issues. Def. Ex. 1, 65:15–17.

Finally, on July 27, 2016, Dr. Pruitt sent the Plaintiff an email—which HR followed up with a formal letter—inquiring about her Indiana educator's license because it showed as "unable to approve." Def. Ex. 16, ECF No. 43-16; Def. Ex. 17, ECF No. 43-17. Although the Plaintiff believed that she already held a valid license since 2012, she applied for a new license, which was issued on August 3, 2016. Def. Ex. 1, 67:16–22, 68:25–69:20, 70:3–10; Def. Ex. 18, ECF No. 43-18. To the Plaintiff, the questions regarding her educator's license indicated that Dr. Pruitt no longer wanted the Plaintiff employed at GCSC. Def. Ex. 1, 72:4–15, 141:6–14.

## C.    FMLA Leave and EEOC Charge of Discrimination

On August 3, 2016, the Plaintiff submitted a request for FMLA leave with GCSC, asking for leave from August 3 to September 6, 2016, to manage her own health condition. Def. Ex. 6, ECF No. 43-6. Specifically, the Plaintiff sought leave based on her doctor's recommendation and because her stress levels had gotten to the point of causing physical issues. Def. Ex. 1, 72:2–25, 75:4–9. GCSC approved the request for FMLA leave. *Id.* at 78:25–79:2. On August 30, 2016, the Plaintiff requested an extension of her FMLA leave until October 26, 2016, which GCSC also approved. *Id.* at 78:14–24; Def. Ex. 7, ECF No. 43-7.

While on FMLA leave, the Plaintiff filed a Charge of Discrimination with the EEOC on September 2, 2016. Def. Ex. 15, ECF No. 43-15. The Plaintiff alleged race and sex discrimination that began on May 1, 2016, noting that it was a "continuing action." *Id.* In her Charge, the Plaintiff described, among other things, the text messages she received from Dr. Pruitt following the conference in May 2016; an angry response from Dr. Pruitt following the removal of a teacher; that the Plaintiff had received good performance evaluations and was not aware of performance concerns; that the Plaintiff's responsibilities over transportation and security were removed and given to an African American employee; and the interaction

6

regarding her teaching license. *Id.* Furthermore, the Plaintiff explained in her deposition that the unwarranted performance concerns were directed at her because she was the only white member of the Central Office. Def. Ex. 1, 76:2–17. She also testified about times when a GCSC board member told the Plaintiff that he could not see how a white woman from Illinois could help Gary's African American children. *Id.* at 76:19–77:4.

The Plaintiff also began applying for jobs with other school districts while she was on leave. *Id.* at 153:18–154:3; Def. Ex. 22, 11–12, ECF No. 43-22. She eventually secured a position with Mid-Valley Special Education Cooperative in Illinois that began in July 2017. Dep. 154:4–7; Def. Ex. 22, 14.

**D.   Problems with Dr. Moore**

After her FMLA leave concluded on October 26, 2016, the Plaintiff returned to work the following Monday. Def. Ex. 1, 79:3–9. When she returned to the office, Dr. Cordia Moore told the Plaintiff that she would be the Plaintiff's supervisor moving forward. *Id.* at 79:10–19. The Plaintiff found Dr. Moore's supervision to be "hostile" and "retaliatory," which the Plaintiff thought was due to the Plaintiff's previously close work relationship with Dr. Pruitt. *Id.* at 80:19–81:3, 81:23–82:20, 134:24–135:12. The Plaintiff said that Dr. Moore did not treat others with hostility, but only directed that treatment toward her and Mr. Mekheil. *Id.* at 81:4–7, 113:20–114:2.

During her deposition, the Plaintiff described a number of ways she found Dr. Moore to be hostile, retaliatory, and biased. *Id.* at 80:19–81:7, 81:23–82:9, 83:1–5. For example, the Plaintiff took issue with Dr. Moore's requirement that the Plaintiff be in her office from 8:00 a.m. to 5:00 p.m., and that she had to use sick leave or personal time if she left earlier. *Id.* at 84:16–23. She did not like the fact that she was required to ask permission from Dr. Moore if she

7

needed to visit a GCSC building, as well as keep a log of when she left and returned. *Id.* at 84:24–85:11. Similarly, if the Plaintiff wanted to attend meetings, she was required to submit a personal development form 15 days in advance and provide an explanation of why she would be attending the meeting. *Id.* at 95:25–96:25. With the exception of Mr. Mekheil, the Plaintiff states that no one else in the Central Office was required to follow these procedures or treated the same way by Dr. Moore. *Id.* at 85:14–16, 97:6–23, 113:9–114:2.

The Plaintiff was also troubled by Dr. Moore's criticism of her work. There were times when Dr. Moore would criticize the Plaintiff for not completing reports in a timely manner, and they had disagreements about completing an English as a Second Language (ESL) report and the proper scope of students' Individual Education Plans. *Id.* at 88:12–89:3, 90:8–22, 93:17–94:19. At one point, Dr. Moore raised concerns about nearly $230,000 in overpayments made to transportation vendors. Def. Ex. 8, ECF No. 43-8; Def. Ex. 1, 86:22–87:2. Dr. Moore suggested the Plaintiff was partially responsible for the overpayments because some payments had occurred between August 2015 and March 2016 when the Plaintiff was in charge of transportation. Def. Ex. 8. Dr. Moore required the Plaintiff to review the records and provide a report explaining any alleged overpayments that occurred during that timeframe. *Id.* The Plaintiff testified that she was not responsible for those payments because they came out of GCSC's Title I funds, which she did not oversee. Def. Ex. 1, 87:20–24.

Finally, in November 2016, Dr. Moore criticized the Plaintiff at a meeting with the other administrators. *Id.* at 94:23–95:7. The Plaintiff testified that Dr. Moore "very clearly said that [the Plaintiff] had mismanaged the ESL program in front of everybody and said, therefore, Ms. Bowman-Beckwith will be taking responsibility for that." *Id.* at 95:5–9. Dr. Moore also removed the Plaintiff's responsibility over the Alternative Education Program. *Id.* at 92:5–18. The

Plaintiff claims that responsibility over these programs went to less-qualified African American employees. Fidishin Decl. ¶¶ 18, 21, ECF No. 47-1.

**E.      Notice of Nonrenewal and Resignation**

On December 14, 2016, Dr. Pruitt sent the Plaintiff a written preliminary notice of the Board's consideration of nonrenewal,[3] which was delivered to the Plaintiff on December 16. Def. Ex. 9, ECF No. 43-9; *see* Def. Ex. 11, ECF No. 43-11. The notice stated that GCSC's Board of Trustees "is considering a decision not to renew [the Plaintiff's] contract as Executive Director of Special Education and Student Support" for the following reasons:

(1) Budgetary reasons which necessitate a reduction in administrative staff,
(2) Due to the restructuring of the administrative staff for the 2017–2018 school year,
(3) Due to the quality of your job performance,
(4) Failure to provide adequate leadership,
(5) Failure to properly implement board policies,
(6) Failure to timely complete necessary reports designated by the superintendent.

Def. Ex. 9. On December 16, Dr. Pruitt also sent an email to the Plaintiff expressing her expectation that certain tasks be completed in an appropriate manner and that she had "a growing concern" for the Plaintiff's work, which she had indicated in May. Def. Ex. 10, ECF No. 43-10. The Plaintiff testified, however, that she was not told of these problems prior to December 2016. Def. Ex. 1, 99:6–22. In fact, the Plaintiff testified that she never received a performance evaluation during her final three years of employment at GCSC. *Id.* at 109:11–18.

On December 20, 2016, the Plaintiff requested a private conference with Dr. Pruitt. Def. Ex. 11. A meeting was held on January 2, 2017, with the Plaintiff, the Plaintiff's attorney, Dr.

---

[3] Under Indiana law, the GCSC Board of Trustees, or an employee at the direction of the Board, was required to give the Plaintiff, as the local director of special education, a written preliminary notice that it was considering nonrenewal of her contract. Ind. Code § 20-28-8-12(a). Once the Plaintiff was given the preliminary notice, she had five days to request a private conference with the superintendent. *Id.* § 20-28-8-12(a)(2). After a conference with the superintendent, the Plaintiff was further entitled to a private conference with the Board if she requested one in another five days. *Id.* § 20-28-8-12(b).

Pruitt, and GCSC's attorney. Def. Ex. 1, 107:13–19. At the meeting, the Plaintiff went over the letter and explained her disagreement with the rationale for nonrenewal given there was no prior documentation of poor performance. *Id.* at 108:11–19, 109:3–10. Dr. Pruitt responded that maybe she should have followed up on things in writing but recalled that they had spoken about issues. *Id.* at 108:23–109:2.

Following the meeting, the Plaintiff was allowed an opportunity to have a private conference with the GCSC Board of School Trustees before a decision of nonrenewal was made, *see* Ind. Code § 20-28-8-12(b); however, there is no evidence that the Plaintiff pursued a conference. Instead, the Plaintiff resigned from her position at GCSC on January 9, 2017, effective June 30, 2017. Def. Ex. 12, ECF No. 43-12. She explained that "a resignation would be more appealing for my professional reputation than a nonrenewal." Def. Ex. 1, 111:21–112:2.

Following her resignation, Dr. Pruitt sent an email to the Plaintiff and Dr. Moore in March 2017 regarding concerns about neglect and compliance in the special education department and requesting a remediation plan. Def. Ex. 13, ECF No. 43-13. Dr. Moore completed a remediation plan identifying concerns with a plan the Plaintiff had drafted for the state and laying out additional steps for the Plaintiff to take. *See* Def. Ex. 14, ECF No. 43-14. The Plaintiff testified that Dr. Moore did not understand what was required for the state reports and that the remediation plan was based on this misunderstanding. Def. Ex. 1, 121:3–11.

The Plaintiff's last day of work at GCSC was approximately June 12, 2017. *Id.* at 130:21–24.

## ANALYSIS

In support of its Motion for Summary Judgment, the Defendant argues that the Plaintiff's race discrimination claim and FMLA claim fail because GCSC did not take an adverse action

against the Plaintiff and, further, that the Plaintiff has not shown any action was taken because of her race or in retaliation for her FMLA leave. The Plaintiff responds that she was subjected to disparate, hostile treatment because of her race and for taking FMLA leave, which ultimately led to her constructive discharge. The Court first considers the motion as it relates to the Plaintiff's race discrimination claim before turning to her FMLA claim.

## A.      Title VII Race Discrimination

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment" because of her race. 42 U.S.C. § 2000e-2(a)(1). At summary judgment, the question is whether the evidence as a whole "would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused [her] discharge or other adverse employment action." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). Although the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), remains a method plaintiffs may use to survive summary judgment, *see Lewis v. Wilkie*, 909 F.3d 858, 867 (7th Cir. 2018), neither party relies on that framework here. Thus, the Court considers whether the evidence as a whole supports the Plaintiff's race discrimination claim. *See Ortiz*, 834 F.3d at 765.

At the outset, the Defendant raises an issue about whether the Plaintiff properly exhausted her claim as it relates to actions occurring after the Plaintiff filed her EEOC Charge on September 2, 2016. Thus, the Court will first determine which allegations were properly exhausted before assessing whether the race discrimination claim survives summary judgment.

11

1.      *Exhaustion and the Scope of the Plaintiff's EEOC Charge of Discrimination*

Before a plaintiff can bring her Title VII claim, she is required to "exhaust [her] administrative remedies by filing charges with the EEOC and receiving a right to sue letter." *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019) (citing *Rush v. McDonald's Corp.*, 966 F.2d 1004, 1110 (7th Cir. 1992)); *see Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019). Then, when filing a suit in federal court, a plaintiff is only allowed to bring "those claims that were included in her EEOC charge, or that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Chaidez*, 937 F.3d at 1004 (quoting *Geldon v. S. Milwaukee Sch. Dist.*, 414 F.3d 817, 819 (7th Cir. 2005)). The purpose of this limitation is to provide an employer with notice of an employee's allegations and offer the employer and the EEOC an opportunity to settle the matter. *Id.* (citing *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009)).

Claims are considered "like or reasonably related when (1) 'there is a reasonable relationship between the allegations in the charge and the claims in the complaint' and (2) 'the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge.'" *Id.* (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)). At a minimum, the allegations in the charge and the complaint must "describe the same circumstances and participants." *Cervantes*, 914 F.3d at 565 (quoting *Conner v. Ill. Dep't of Nat. Res.*, 413 F.3d 675, 680 (7th Cir. 2005)). It is not enough to simply assert the same kind of discrimination; there needs to be a factual relationship between the different allegations. *Chaidez*, 937 F.3d at 1005.

On September 2, 2016, the Plaintiff filed her Charge, claiming discrimination based on race and sex. *See* Def. Ex. 15. The Charge states that the discrimination began on May 1, 2016,

at the earliest, and the Plaintiff checked the box for a "continuing action." *Id.* The Plaintiff claimed that Dr. Pruitt "discriminated against [her], and subjected [her] to a hostile work environment on the basis of race and sex." *Id.* In support of those claims, she described Dr. Pruitt's text messages following the conference; Dr. Pruitt becoming angry and telling the Plaintiff, "I'm the Superintendent" and "Nobody takes power from me;" Dr. Pruitt removing the Plaintiff's supervisory authority over transportation and security; and Dr. Pruitt inquiring about the Plaintiff's teaching license. *Id.*

In contrast, the Plaintiff's Complaint includes a host of new allegations about Dr. Moore and the events leading up to the Plaintiff's resignation, all of which occurred after September 2, 2016. *See* Compl. ¶¶ 20–35, ECF No. 1. These allegations include, among other things, Dr. Moore's requirements on timekeeping, work hours, and professional development requests; the way Dr. Moore managed the Plaintiff when drafting reports; Dr. Moore's removal of the Plaintiff's responsibility over ESL and the alternative education program; and Dr. Moore's disparaging and hostile remark directed at the Plaintiff. *Id.* The Plaintiff's Complaint also includes allegations about the preliminary notice of nonrenewal and her resignation, which she claims to be a constructive termination. *Id.* at ¶¶ 37–42. These allegations were all incorporated into the Plaintiff's single count of race discrimination, where she asserts that GCSC "subject[ed] [her] to terms and conditions of employment that were less favorable than those afforded to similarly-situated African American and/or Black employees." *Id.* at ¶¶ 43–46.

In comparing her Charge and her Complaint, the Court concludes that the Plaintiff's new allegations—i.e., Dr. Moore's discriminatory actions and the Plaintiff's constructive discharge—cannot serve as the basis for her race discrimination claim because they were not properly exhausted. Starting with the allegations about Dr. Moore's discriminatory actions, those did not

involve the same circumstances and participants as her EEOC Charge. *See Cervantes*, 914 F.3d at 565. Dr. Moore was referenced once in the Charge, but in a way that did not allege any discriminatory or harassing conduct. *See* Def. Ex. 15 (referencing the Plaintiff's discussion with Dr. Moore about removing a teacher for disciplinary reasons). After October 26, 2016, Dr. Moore took discrete actions involving the Plaintiff's job responsibilities and work conditions, and the Plaintiff has not shown any connection between those actions and Dr. Pruitt's conduct prior to the Plaintiff filing the EEOC Charge on September 2, 2016. *See Rush*, 966 F.2d at 1110 ("An aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination."). Indeed, Dr. Pruitt was not alleged to have been involved with or to have directed Dr. Moore's discriminatory conduct. Since the allegations related to Dr. Moore go beyond the scope of the EEOC Charge, they were not properly exhausted and cannot serve as the basis for the Plaintiff's race discrimination claim.

Likewise, the Plaintiff's constructive discharge claim was not properly exhausted before the EEOC. A constructive discharge claim "accrues only after an employee resigns," *Green v. Brennan*, 578 U.S. 547, 554 (2016); *Hatton v. Shulkin*, No. 1:17-CV-488, 2018 WL 2162352, at *4 (N.D. Ind. May 10, 2018), which, for the Plaintiff, occurred in January 2017. If the Plaintiff wanted to properly exhaust her constructive discharge claim, she should have filed a new charge with the EEOC after she resigned to "allow the agency to try to resolve the matter and fulfill its obligation to investigate the facts and circumstances related to the [resignation]." *Teal*, 559 F.3d at 693; *see Hatton*, 2018 WL 2162352, at *4. Since she did not file a new EEOC charge following her resignation, her constructive discharge claim was not properly exhausted and will not be considered.

14

The Plaintiff raises three arguments as to why the new allegations should be considered "like or reasonably related" to her Charge allegations. First, she contends that all the allegations relate to the same participants—namely, GCSC. *See* Pl. Resp. 9–10, ECF No. 46. But that would subvert the "like or reasonably related" test because employers are always the focus of Title VII actions. *See* 42 U.S.C. § 2000e-2(a) (defining "an unlawful employment practice for an *employer*" (emphasis added)); *Gastineau v. Fleet Mortg. Corp.*, 137 F.3d 490, 494 (7th Cir. 1998) (recognizing that only employers, not individual employees, are liable under Title VII).

Second, the Plaintiff contends that the new allegations in her Complaint all "describe the same type of conduct." Pl. Resp. 10. This also goes too far because "[a]ny additional alleged act of discrimination can always be fit in and become part of an overall general pattern of discrimination." *Jones v. Res-Care, Inc.*, 613 F.3d 665, 670 (7th Cir. 2010); *see Cheek*, 31 F.3d at 501 ("Because an employer may discriminate on the basis of sex in numerous ways, a claim of sex discrimination in an EEOC charge and a claim of sex discrimination in a complaint are not alike or reasonably related just because they both assert forms of sex discrimination."). There needs to be a greater factual connection between the allegations in the Plaintiff's Charge and the new allegations raised in her Complaint.

Third, the Plaintiff argues that the purposes of exhaustion are satisfied because her Charge provided notice to GCSC and GCSC refused to attempt conciliation. Pl. Resp. 10. The Charge does not, however, include a hint of discrimination on behalf of Dr. Moore. And since "[t]he scope of the EEOC's investigation was defined by" the Plaintiff in her Charge, the EEOC would not have had the opportunity to investigate Dr. Moore nor help the parties reach a settlement regarding her conduct. *Teal*, 559 F.3d at 692.

15

Ultimately, these new discrimination claims went far beyond the scope of the Plaintiff's Charge in both the relevant circumstances and participants. Realistically, it was impossible for her to exhaust these allegations in her original EEOC Charge because they occurred after she filed the Charge on September 2, 2016. *See Conner*, 413 F.3d at 680 (concluding that a December 2002 non-promotion was outside the scope of the plaintiff's EEOC charges because the charges were dated November 1, 2002); *see also Cooper v. Eaton Corp.*, 498 F. Supp. 3d 1053, 1068 (N.D. Ind. 2020) (stating that "the failure by a plaintiff to amend her pending charge to include the allegedly new conduct renders the later-alleged conduct necessarily outside scope of the EEOC charge" and collecting cases reaching a similar conclusion).[4] But the proper course of action would have been to amend her original Charge or file a new one. *See Teal*, 559 F.3d at 693. Since that did not occur, the Plaintiff's failure to exhaust the claims related to Dr. Moore and her constructive discharge result in them not being considered under her race discrimination claim.

2.      *Merits of the Plaintiff's Race Discrimination Claims*

With the proper scope of the Plaintiff's race discrimination claim established, the Court turns to whether the Plaintiff's race discrimination claim survives summary judgment. In

---

[4] There is an exception to the ordinary exhaustion rule when a plaintiff is bringing a retaliation claim that alleges the employer retaliated against a plaintiff for filing the original EEOC Charge. *See Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1030 (7th Cir. 2013); *see also Williams v. Bd. of Educ. of City of Chi.*, 982 F.3d 495, 503 n.13 (7th Cir. 2020) (explaining that it will consider allegedly retaliatory acts occurring after the plaintiff's charge of discrimination was filed); *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 857 n.11 (7th Cir. 2019) ("[W]e have long held that a plaintiff need not file a new charge alleging post-charge retaliation by the employer."). In those cases, a plaintiff is not required to file new EEOC charges for retaliatory conduct occurring after the original charge. *Luevano*, 722 F.3d at 1030. This exception does not apply to the Plaintiff's case. The Plaintiff includes one statement in her Complaint and Declaration that she was retaliated against for filing a charge with the EEOC. *See* Compl. ¶ 39; Fidishin Decl. ¶ 36. However, her Complaint does not include a count for Title VII retaliation, nor has she argued in her summary judgment brief that she was retaliated against for filing her EEOC Charge. Thus, she has waived any argument that an independent Title VII retaliation claim justifies considering the non-exhausted allegations. *See Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013).

assessing her Title VII claim, the Court considers whether the evidence as a whole "would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the [plaintiff's] discharge or other adverse employment action." *Ferrill*, 860 F.3d at 499. The Seventh Circuit Court of Appeals has recognized "reserve discrimination" cases, explaining that "the protections of Title VII are not limited to members of historically discriminated-against groups." *See Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454–55 (7th Cir. 1999) (citations omitted).

The Defendant first argues that, because the Plaintiff is white, she must show sufficient "background circumstances" to suggest GCSC "has reason or inclination to discriminate invidiously against whites." Def. Br. 13 (quoting *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016)); *see* Def. Reply 9, ECF No. 48. This "background circumstances" requirement is a modification to the first element of the prima facie case under the *McDonnell Douglas* framework, *see Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 574 (7th Cir. 2021), which the Plaintiff does not rely on. Regardless, the facts show that the Plaintiff was the only Caucasian in the Central Office and, with the exception of Mr. Mekheil, everyone else was African American, including her supervisors. *See Mills*, 171 F.3d at 455 (relying on *Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1534 (10th Cir. 1995), which concluded that a plaintiff showed sufficient background circumstances where she was the only white employee in the department and nearly all of the decision makers were Hispanic); *see also Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 822 (7th Cir. 2006) (finding sufficient background circumstances where a black employer terminated white employees and hired black replacement workers).

The Plaintiff, however, runs into problems (1) identifying an adverse employment action and (2) showing that any action was taken because of her race. Beginning with the adverse employment action element, the Plaintiff needs to show "a materially adverse change in the

17

terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (quoting *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000)). That might include a negative impact on the Plaintiff's wealth and career prospects or other "changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 470 (7th Cir. 2018) (quoting *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016)); *see Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1005 (7th Cir. 2018). Because the Plaintiff failed to exhaust her claims related to Dr. Moore and constructive termination, her claims boil down to Dr. Pruitt removing the Plaintiff's responsibility over transportation and security and Dr. Pruitt's acts of hostility changing her work conditions.

The removal of Plaintiff's responsibility over transportation and security does not supply the necessary adverse action because that only amounted to a "modest alteration" of her job duties. *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 789 (7th Cir. 2019); *see Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 885–86 (7th Cir. 1989) (concluding that reassignment to a position as a dual principal of two elementary schools was not an adverse employment action). These changes did not impact her salary or benefits and involved duties outside her core role as the Executive Director of Special Education. Since she retained her primary responsibilities, it is difficult to imagine how this action would reduce her "career prospects by preventing her from using her skills and experience." *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1069 (7th Cir. 2012) (citation omitted); *see Koty v. DuPage County*, 900 F.3d 515, 520 (7th Cir. 2018) (explaining how a materially adverse action "represents a *significant* alteration to the employee's duties, which is often reflected by a corresponding change in work hours,

18

compensation, or career prospects" (citation omitted)). While the Plaintiff might have been disappointed with Dr. Pruitt's decision, the removal of transportation and security oversight did not amount to a significant alteration of her responsibilities.

Similarly, Dr. Pruitt's alleged hostility—i.e., angry text messages and inquiring about her teaching license—did not create a significant negative change to her work conditions. Changes that amount to an adverse employment action need to involve a degree of objective hardship, and the Plaintiff's subjective unhappiness will not suffice. *See Madlock*, 885 F.3d at 471; *see also Lewis*, 909 F.3d at 870–71 ("[N]ot everything that makes an employee unhappy is an actionable adverse action." (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996))). The performance critiques Dr. Pruitt sent in emails and text messages—even if the Plaintiff found them unwarranted—do not meet this objective standard. *See Abrego v. Wilkie*, 907 F.3d 1004, 1012 n.2 (7th Cir. 2018) ("[N]egative evaluations and letters of inquiry are not adverse employment actions."). The comments seemed to strike a chord with the Plaintiff because they marked a shift in her relationship with Dr. Pruitt; however, getting the cold shoulder from a supervisor does not equate to an adverse employment action. *See Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1107 (7th Cir. 2012). And as for Dr. Pruitt's inquiry into the Plaintiff's teaching license, Dr. Pruitt acted reasonably considering the state website showed the Plaintiff did not have an active license. Even if the Plaintiff attributes an alternative motive to Dr. Pruitt's inquiry, ensuring that the Plaintiff was properly licensed did not alter her employment in a negative way.

The Plaintiff argues that, when taken together, Dr. Pruitt's actions meet the standard,[5] especially considering she suffered physical illness and required medical treatment as a result.

---

[5] The Court notes that the Plaintiff's argument that the "actions together may constitute an adverse employment action," Pl. Resp. 11, gets close to reasserting her hostile work environment claim, *see Boss*,

*See* Pl. Resp. 11, 13. While the Plaintiff may have suffered medical complications following Dr. Pruitt's actions, the Court's role is to determine whether the action can "be characterized as objectively creating a hardship." *Madlock*, 885 F.3d at 471; *see Sklyarsky v. ABM Janitorial Servs.-N. Cent., Inc.*, 494 F. App'x 619, 622 (7th Cir. 2012) ("Even though [the plaintiff] alleges that the second reprimand left him ill, it did not change his employment conditions and therefore cannot support a claim of discrimination."). None of the actions described by the Plaintiff suggest anything more than a difficult boss and a stressful job, which do not amount to a materially adverse change in her employment. *See Hancock v. Potter*, 531 F.3d 474, 478 (7th Cir. 2008) (explaining that "general hostility" will not be considered an adverse employment action "unless it was severe and pervasive"). Thus, the Plaintiff has failed to identify an adverse employment action that would form the basis of her race discrimination claim.

Next, the Plaintiff fails to present evidence indicating that any of these actions—assuming they were materially adverse—were taken because of her race. In support of her claim, the Plaintiff argues that the following evidence shows discriminatory motivation: (1) she was the only Caucasian in the Central Office; (2) she was treated differently than other employees; (3) when duties were stripped from the Plaintiff, the people taking over were less-qualified African Americans; and (4) a pervasive preference for African Americans exemplified by a GCSC board member's comment "that he could not see how a white woman from Illinois could help Gary's African American children." Pl. Resp. 18. While these arguments, on their face, could suggest that Dr. Pruitt's actions were taken because of the Plaintiff's race, they ultimately fall apart

---

816 F.3d at 918 ("Insofar as [the plaintiff] argues for a 'totality of the circumstances' view, the caselaw limits that approach to his hostile work environment claims."). The Court already dismissed the Plaintiff's hostile work environment claim because the allegations failed to describe sufficiently severe conditions to show an abusive working environment. *See* Nov. 29, 2018 Op. & Order 7–8.

because they are largely based on the Plaintiff's conclusory testimony or evidence unrelated to Dr. Pruitt's actions.

For starters, the Plaintiff's claim that she was treated differently than other employees relates exclusively to requirements imposed by Dr. Moore; the Plaintiff never refers to Dr. Pruitt in those statements. *See* Def. Ex. 1, 80:19–81:7, 97:6–23, 113:9–114:2; Fidishin Decl. ¶¶ 25–26, 29–30; *see also* Def. Ex. 1, 38:16–21 (stating that Dr. Pruitt's erratic behavior was originally directed toward others, not the Plaintiff), 55:17–57:23 (identifying instances where Dr. Pruitt was hostile toward others). So for the claims that were properly exhausted, there is no evidence that Dr. Pruitt treated the Plaintiff differently than other similarly situated employees.

Likewise, except for her own deposition testimony, the Plaintiff fails to support her claim that less-qualified African Americans took over her responsibilities for transportation and security. *See Formella*, 817 F.3d at 513 ("Other than [the plaintiff's] own unsupported deposition testimony, [the plaintiff] has presented no admissible evidence to support this argument. Such speculation on the part of [the plaintiff] 'cannot be used to defeat a motion for summary judgment.'" (quoting *Ballance*, 424 F.3d at 620)). The Defendant states that Ron Gordon (African American) was hired in July or August 2016 to oversee transportation and that he had prior experience working in the railroad transportation industry. Def. Ex. 23, 9. Moreover, the Defendant states that Dr. Pruitt took over responsibility of security. *Id.* Except for unsupported speculation about Mr. Gordon's work history, the Plaintiff provides no evidence that she was more qualified than Mr. Gordon or Dr. Pruitt to oversee transportation and security. She needs to provide more evidence to survive summary judgment.

Finally, the Plaintiff fails to connect the GCSC board member's comments to any of Dr. Pruitt's actions. *See Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 997 (7th Cir. 2020) (requiring

a causal nexus between unprofessional remarks and an adverse employment action in order to show discriminatory intent). She never suggests that Dr. Pruitt's actions were taken at the behest of that board member, and the Plaintiff even testified that she assumed Dr. Pruitt did not share the board member's views. Def. Ex. 1, 76:9–77:15.

At bottom, it seems the only evidence showing a causal connection was the fact that the Plaintiff was the sole Caucasian employee in the Central Office. That fact alone will not avoid summary judgment. *See Loving v. Lew*, 512 F. App'x 616, 619 (7th Cir. 2013) ("[T]o survive summary judgment a plaintiff must produce evidence that the conduct was at least motivated by race . . . . [T]he fact that [the plaintiff] was the only black employee in her group is insufficient to support that inference."). Rather, the evidence as a whole points to the Plaintiff's quality of work and workload as the reason—whether justified or not—for Dr. Pruitt's critical messages and decision to remove the Plaintiff's responsibility over transportation and security. Simply put, "[a]ll of the criticisms used non-racial language, and nothing else about their context suggests that they were racially motivated." *Brown*, 700 F.3d at 1106. Thus, a reasonable jury could not conclude that Dr. Pruitt's actions were taken because of the Plaintiff's race.

Accordingly, the Court grants summary judgment in favor of the Defendant on the Plaintiff's Title VII race discrimination claim (Count 1).

## B.   FMLA Retaliation[6]

The Plaintiff's final claim is that the Defendant retaliated against her for taking FMLA leave by stripping her of certain responsibilities and imposing timekeeping and attendance requirements. The FMLA makes it illegal for an employer to retaliate against an employee for

---

[6] In her Complaint, the Plaintiff also alleges that the Defendant interfered with her future exercise of FMLA rights. Compl. ¶ 56. At summary judgment, she only argues that she was retaliated against, *see* Pl. Resp. 19–20, and ignores the Defendant's arguments regarding FMLA interference, *see* Def. Br. 22. Thus, the Plaintiff has waived any FMLA interference claim. *See Goodpaster*, 736 F.3d at 1075.

taking FMLA leave. *See Freelain v. Village of Oak Park*, 888 F.3d 895, 900 (7th Cir. 2018) (citing 29 U.S.C. § 2615). To prove a retaliation claim, a plaintiff must establish that (1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against her, and (3) there is a causal connection between the two. *Id.* at 901 (citing *Pagel v. TIN, Inc.*, 695 F.3d 622, 631 (7th Cir. 2012)). A retaliation claim "requires proof of discriminatory or retaliatory intent." *Goelzer v. Sheboygan County*, 604 F.3d 987, 995 (7th Cir. 2010) (quoting *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)). "To succeed on a retaliation claim, the plaintiff does not need to prove that 'retaliation was the *only* reason for [an adverse action]; she may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.'" *Id.* at 995 (quoting *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741–42 (7th Cir. 2008)).

Here, the Plaintiff's FMLA retaliation claim fails because she has not shown a causal connection between any action and her FMLA leave. The only evidence she points to is that certain timekeeping and attendance restrictions were imposed "immediately" upon her return from leave. *See* Pl. Resp. 19–20. However, "'suspicious timing alone rarely is sufficient to create a triable issue,' and on a motion for summary judgment, 'mere temporal proximity is not enough to establish a genuine issue of material fact.'" *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018) (quoting *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009)). Instead, the Plaintiff is obligated to present additional evidence showing pretext. *Id.* at 188–89 (quoting *Tibbs v. Admin. Off. of the Ill. Cts.*, 860 F.3d 502, 505 (7th Cir. 2017)). But the Plaintiff has presented no such evidence to support her claim. In fact, Mr. Mekheil, who did not take FMLA leave, *see* Def. Ex. 21, ECF No. 43-21, was also subject to the same timekeeping and attendance restrictions as the Plaintiff. *Cf. Coleman v. Donahoe*, 667 F.3d 835, 857–58 (7th Cir. 2012) (recognizing that more

23

favorable treatment of similarly situated employees outside of the plaintiff's protected class can be evidence of pretext). The Plaintiff's argument that Mr. Mekheil was merely being used to cover up evidence of retaliation is pure speculation devoid of any evidentiary support.

Since the Plaintiff presents no other arguments or evidence to support her FMLA retaliation claim, the Court grants summary judgment in favor of the Defendant on the Plaintiff's FMLA retaliation claim (Count 4).

## CONCLUSION

For the reasons set forth above, the Court hereby GRANTS the Defendant's Motion for Summary Judgment [ECF No. 41]. The Court DIRECTS the Clerk of Court to enter judgment in favor of the Defendant Gary Community School Corporation and against the Plaintiff Marianne Fidishin.

SO ORDERED on February 2, 2022.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT